Good morning. Philip Rudd of SACS Tierney on behalf of the appellant SJ Group LLC. I'd like to reserve a couple of minutes at the end of my time for rebuttal. SJ Group did nothing wrong here and yet it has been deprived of its quarter of a million dollar earnest money deposit for three years and has incurred tens of SJ Group didn't breach a contract. It didn't default on any kind of obligation to anybody. Rather, as bankruptcy judge Collins correctly found after summary judgment proceedings, SJ Group properly and timely terminated the purchase and sale agreement and terminated any contractual obligations that it had pursuant to that agreement. Therefore, it is entitled, SJ Group is entitled to the recovery of its earnest money deposit. This all started because my client simply wanted to buy some property out of a bankruptcy estate, so he complied with the seller's procedures for doing that. He signed a purchase and sale agreement that was provided and required by the seller, the liquidating agent. He deposited a quarter of a million dollars as an earnest money deposit in connection with that sale as required by the seller. He participated in the auction sale. He bid the price up to over twice, I believe, the amount of the original bid and he was a successful bidder. Following the auction sale, the liquidating agent, the seller, provided him with a fully executed copy of the purchase and sale agreement and it was the same exact purchase and sale agreement that he had signed. There were no modifications, there were no amendments and nothing was stricken from that purchase and sale agreement. Then, between the time of the auction sale and the time that the sale was closed, a flood caused damage to the property that he was going to buy. Notwithstanding that damage, my client tried to salvage the deal by going to the seller with a flood and this casualty, SJ Group timely terminated the purchase agreement pursuant to its terms. The purchase agreement expressly and specifically provides that in the event of a casualty or flood that damages the property, SJ Group could terminate the PSA and recover the earnest money deposit. So, he terminated it timely and asked for his deposit back, but the seller refused. The seller refused, asserting that the flood was not a casualty under the purchase agreement and, therefore, the seller was keeping his quarter of a million dollar earnest money deposit. So, do you see the sale order as ambiguous where it says the deposit is not refundable? Yes, and here's, well, a few things about the sale order and the potential for ambiguity. In order to discern the meaning and purpose of any writing, whether it's a sale order or a purchase agreement or a novel or poetry or whatever, in order to understand the meaning of any writing, you have to look at the writing as a whole. You can't pick and choose certain parts of it in isolation and in a vacuum and reach any kind of proper conclusion about what that writing means. Here, if you read the sale order as a whole, it absolutely requires the reader to look at other aspects of that sale. It absolutely requires you to look at the context of that sale, and here's why. There's at least six reasons why you're required to look at other aspects of this sale and why the sale order is therefore ambiguous with respect to those seven words, okay? First, the sale order specifically provides that it is made, quote, pursuant to the plan confirmation order, and it repeatedly refers to the plan confirmation order and to the plan. Therefore, any review of the sale order necessarily requires the reader to understand what the plan confirmation order says and what the plan says. Among other things, the plan at pages 12 and 13, which is ER 349 and 350, provides that the liquidating agent who was appointed pursuant to the plan will have the power and authority, without the need for further order of the court, to execute all contracts for sale and other documents necessary to effectuate the sale of the property. Therefore, any proper reading of the sale order, you need to read the plan, and then you need to understand what the contracts for sale and other documents that are necessary for the effectuation of the sale are. But then the natural way to read that clause is future, prospectively, that there's going to be more. That there's going to be a purchase agreement, and there was. But this was signed before the order, right? Right. Does it matter? Right. Well, what I'm saying is, what we're talking about is, is the sale order ambiguous, and what I'm saying is, in order to understand the sale order, you have to look at other things. You have to look at the plan confirmation order. You have to look at the purchase agreement. In fact, the plan also addresses the purchase agreement. The sale order, or the plan also says that. I'm sorry, the plan, the confirmation plan addresses the purchase sale agreement? It addresses the fact that there needs to be a contract for sale. That provision says that the liquidating agent shall have the authority to execute all contracts for sale and other documents necessary to effectuate the sale of the property. But that demonstrates that there will be a contract for sale, right? And in the future. But yeah, in the future, but this was signed before the order. So how do we square that? Well, you square that because the sale order was specifically made, quote, pursuant to the plan confirmation order. So the plan confirmation order requires that there be a sale agreement. If there's a sale agreement, that requires the reader to understand what that sale agreement means in order to understand what the sale order means. But that's just one example. There's other examples as well. For example, in the plan confirmation order, there's a provision that says that the winning bidder's deposit will be forfeited if the purchase agreement is terminated by the debtor as a result of a breach by the winning bidder of its obligations there. So it talks about this concept that the earnest money deposit will be forfeited, but only if the agreement is terminated by the debtor. Here, this agreement wasn't terminated by the debtor. This purchase agreement was terminated by the buyer because of the seller's inability to perform, because of the casualty that occurred. And Judge Collins specifically found that it was properly terminated pursuant to those terms of the purchase of sale agreement. Counsel, may I ask a question? Sure. Counsel? Yes. I'd like to ask a question. Judge Humatua says that, I mean, it's replete with Judge Sala unwittingly entered this order and made an error in imposing terms on sale, which the parties did not agree. But she says that you should have objected at the time. What's your response to that? Sure. A few things. First, and Judge Collins recognized this, the sale order doesn't refer to the purchase agreement, which is just unusual. And Judge Collins recognized that. Frankly, my belief is that because it's just sloppy drafting. The sale order should refer to the purchase agreement. When Judge Humatua was talking about the mistake that Judge Sala made, the fact is that, and I'm sorry, Judge, what was your question again? I got distracted. Okay, so Judge Humatua says, well, if there was a mistake, you should have objected at the time. And maybe I'll supply the answer I think you might give, which is you didn't realize at the time that the sale order would be interpreted to erase the buyer protection or the casualty clause from the PSA. That is exactly right, Judge. I mean, I don't want to make your argument for you, but I just wanted to know what the response was. Yeah, and I apologize for losing my train of thought. But yes, that's absolutely right. That's absolutely right. There is nothing inconsistent. Nothing inconsistent between what the sale order says and what the purchase agreement that my client signed says. We can see that the purchase agreement does say that the winning bidder's bid will be nonrefundable. But that is with respect to any contingencies that they don't satisfy. There is nothing in the sale order that then goes on to say, by the way, if you, buyer, properly terminate this PSA, then you, buyer, are entitled to get your earnest money back. It doesn't say that that requirement under the PSA is eliminated. Nothing says that. Counsel, I know that Judge Sala recused himself from this case, but could you go back to the beneficiary court to amend the order to clarify what they meant? Well, two things. I don't think that that's necessary because I think if you apply all of the appropriate principles of contract interpretation, you, you three, can interpret this order properly to recognize that those seven words in that order do not supersede the PSA. And that the PSA that Judge Collins found was a binding and enforceable contract is intact. Those buyer protections remain intact. The sale order did nothing to change that. I don't think that there's really any reason to go back to Judge Sala and ask him to amend that order. And, in fact, we never even had that opportunity because Judge Collins just sua sponte determined that the sale order superseded the PSA. So I don't think that that's necessary. This court can look at the record, look at the PSA, can look at the sale order, can look at all the circumstances surrounding the entry of that sale order and conclude that the sale order did not supersede the PSA. That those buyer protections in that sale order, or in that PSA, survived the sale order and are enforceable. And that, therefore, SJ Group is entitled to the recovery of the earnest money deposit. Now, part of what you were asking is, is this, and I'll address this briefly, but I'll reserve some time. This is not a collateral attack on that sale order either. What we're doing, what we're challenging is Judge Collins's improper interpretation of that sale order. We're not asking for that sale order to be overturned or anything. It's just the improper interpretation that we're challenging. Another one of the issues that has been raised is, well, but sale orders are supposed to be final. Sure, I agree with that. But this isn't the situation where all those cases that they cited, where the buyer bought something as is, where is, at a bankruptcy auction, and then came back after the auction and reneged on his obligation to pay. And this isn't something where there was a prior defect that the buyer failed to discover, and he came in later and said, because of that defect, I'm not going to do this. That's not that situation. This is the situation where the seller could not perform and did not perform. And the buyer is entitled to recover his or his money. So I'll reserve two minutes. Good morning, Ernest. If that may please the court, Greg Jones on behalf of Eric Haley, the liquidating agent for the Chapter 11 debtor, Regency Park Capital, 2001 Inc. I would like to start a little bit out of order on the arguments and address some of the questions that were asked of the appellant. And specifically, there was a reference to a comment that was made by the district court judge in affirming the bankruptcy court's order that perhaps the order had unwittingly overlooked the PSA. That was dictated in speculation on the part of the district court judge. But I disagree with that analysis and that speculation. I believe it's just as likely that in entering the sale order and not referring to the PSA, not incorporating its terms by reference, each of those things that were supposedly overlooked, that it was done because it was of nominal importance. The PSA was of much subservient importance. And it was not something that really was necessary in the sale order. The sale order is not ambiguous with respect to the core term that is at issue here, which is... So your argument is the PSA was not important? I mean, it led them to cough over a quarter million dollars. They did that contingent on the PSA, correct? No, no, Your Honor. They did not do it contingent on the PSA. And that is because there's only a conflict and a potential ambiguity if the PSA is somehow elevated above the sale order. The sale occurred because of the auction terms that were established prior to the auction. They were announced to those bidders that were present. And the sale occurred when those bidders bid and the sale closed. And the court announced that. So that was the basis for this sale and this auction. The terms that were announced beforehand did not, by the judge, and read by the judge, confirmed by the judge, discussed by counsel expressly, didn't include the PSA. When was the quarter million dollars handed over? That was prior to the bidding. I don't know if it was the same day or if it was the day prior, but that was one of the requirements of participating in the auction. But wasn't it simultaneously with at least the signing of the PSA by at least one side of the group? No, Your Honor. I don't believe that's the case. It's not in the record. I believe the record is just that it was signed at some point prior to the sale order going into placement, whether that was the same day as the sale, whether it was subsequent to the sale is not clear. You're saying that they handed over a quarter million dollars with no agreements whatsoever, or they just deposited it with nothing? Not at all, Your Honor. It certainly was handed over to our knowledge, and based upon the record, on the signing of a contract, the PSA, which is a contract. That it was handed over pursuant to the terms and conditions of the sale that were announced by the court. So this is a bankruptcy sale. I thought it was handed over the day before, did you? Right. But then the conditions of the sale were announced the day of the sale. So it wasn't, I mean, under your theory, they just handed over a quarter million dollars with no protections whatsoever. No, Your Honor. What I'm saying is that the terms of the sale were established prior to the day of the sale, prior and independent of the judge announcing them. What happened at the, those were part of the order setting the sale, and they're frankly consistent with liquidation sales in bankruptcy court, and that's how you get the parties to participate. And so the parties, when I say the parties, that includes bidders, other competing bidders. They appeared at the sale based upon the terms that had been established, and that included each of those bidders having put down a bid, a deposit, non-refundable bid deposit. So when Judge Sala— But with the PSA, at least, they were aware of the PSA at that point. The, who was aware, Your Honor? The bidder, in this case. Yeah, the, I don't know for a fact whether all the bidders were aware of it or whether it was on their minds or not, but it, that had been established. That had, that was the stocking horse bidder's contract that had been, and that was not drafted by the court. It was negotiated by any of the parties. That was a leftover from, that was the stocking horse bidder's contract. And so the, when the parties appeared, they appeared based upon, they bid not on the condition that expressly that the terms of the PSA were going to control the bid and the auction, but rather the sale terms as announced beforehand. And then as discussed at the time, at the hearing when the sale occurred, and that was one of the reasons that it was raised initially by counsel for Mr. Haley, you know, who was, you know, discussing the sale, who had prepared and, and for, you know, provided the court that that would happen. So it was with respect to the issue that's before the court, whether those bid deposits would be non-refundable. That issue was, was discussed to make it clear, to make it express. And, and as a result, Judge Sala said, yes, the rules of the auction will require that those bid deposits are non-refundable if, if the winning bidder closes for any reason. One of the other attorneys for the Chapter 11 debtors raised that again and, and, and confirmed it, which, which was unusual to have a term such as that confirmed in those different ways. And so that is an important term to this sale. And it's, and I believe it's important to understand the context of the sale, the context of the, of the bidding for the court to understand that and, and, and to understand how the PSA is, is a sort of subsidiary importance. Immaterial in, in, in. Well, I mean, that's the point that you, you should look at the sales order in context. And, you know, the context is that there was a PSA at least contemplated by the parties to a quarter million dollars was handed over. And then the, the sales order comes out and it doesn't directly contradict this purchase sales agreement. Would you agree? And so. I do disagree, Your Honor. It does, on this, on the term that's before the court, on the, on the, the term that was before the bankruptcy court. And that is that the, the bid deposit is non-refundable for any reason. Isn't that exact same language in the PSA? And then there are exceptions? Section 2 of the PSA, I think, says non-refundable in all circumstances. So, how is that inconsistent with the language in the sale order? Well, it's, that language isn't inconsistent. The, the, the application of, of, of, you know, the Section 15B, I believe it is, on the casualty, that's, that would be inconsistent with that express language. But, but the P, that language that you're, that we're talking about, that, that would be required to make it ambiguous, that's not in the sale order. So, it, for the, the sale order, which is consistent with what was announced before, during, and after the hearing, is that it's non-refundable for, for any reason. And, and, and the minute entry after that said that. And so, the, and the sale order said it. So, to, for. That isn't ambiguous in our mind. Yes. Council, you represent the trustee, is that right? No, it's akin to a trustee, but it's a, in this case, it was a liquidating agent for the Chapter 11. Entire proceeding. So, I'm just curious as to, so, you, you say that you get to hang on to the $250,000 deposit for this Motel 8. What would, what would that money then be used for? To pay other creditors of the estate? Well, it will, it would be used to pay the creditors of the estate and, and the equity holders, I believe, are, are also be paid. But, wait, who are the equity holders? Well, your honor, I, I am not involved in the, in the, that aspect of the, of the, of the bankruptcy, but my understanding is that at this point, there's been a, a plan and the, and the, and that the, the net assets will be distributed to, I believe the equity holders and, and, and whether they're also creditors or not, I don't, I don't know that. Wait, who are the equity holders? So, you mean the debtors? The debtor is, is, is Regency Park Capital 2011, and, and, but, but I, I believe I can answer the court's question in terms of what is that money to be used for? It's to be used to defray the loss that occurred because of the, of the failure to close. Because what happened was there was the, there was the auction bid that was made on, on the the result of that as part of the process of, of the, the auction and pursuant to the sale order was there was a backup bid that was more than a million dollars less. And because of the repudiation of the contract, because of the failure to close, the debtor lost over a million dollars. And so the $250,000. Wait a second, the debtor didn't necessarily lose over a million dollars. It just got the second bid. I mean, it's, that, that's illusory. Just because SJ Group bidded up in dollars higher in order to get the property. So, the debtor didn't really lose dollars. The difference, the difference between the, the contract, you know, the price, the, the auction price and what, what the backup bid, which was what it ultimately had to, to, you know, sell the property for, that's over a million dollars. And, and the time of the auction, the backup bid, the second bid was much higher than that. And so, but for SJ Group bidding it to, to six, over six million and agreeing on those terms, but for that, the, the next highest bidder would have been substantially higher and just, just under six million dollars. It, the backup bid did not equal the, the, the price, the second highest price at the time of the auction. Time's up, is that okay? I thought I was being told that. So, that, that may be a little bit counterintuitive, but what, but there were two, two primary bidders, was the NSJ Group and the, the bidder who was the, the backup bidder. So, the, the, when the, when the sale ended, it ended on the basis of SJ Group agreeing to pay, pay that price. And the bidder who had been in second place, who, who, who was, I believe it was approximately 100,000, less than that at the time, the next highest bidder. Asked to be allowed to have a backup bid in the amount that it did, which was approximately 5.1 million, that's in the record. And so, the, the amount of the backup bid was different from, you know, from, from. Did the sale, did the sale go through with the backup bid? Yes, it did, Your Honor. And so, that, that's why I say that it lost that, over a million dollars because it, and I realize it wasn't, you know, money that it had, but it's, it, it, it suffered a loss between the amount that it sold the property for at the sale to the highest bidder and the amount that it had to sell it for the backup bidder. But I didn't really say, the point is that, that SJ Group, up until the closing, had the right to withdraw from the sale if there was a casualty and a casualty occurred. So, I don't see how you can say that they lost anything because the SJ Group wasn't obligated to pay them the, the amount of the bid they made if there was a casualty and it withdrew from the sale. Your Honor, that, that's only true if, if the PSA trumps the, the sale order because the sale order says for, that the, the bid deposit is, is non-refundable for any reason. And again, going back to the auction, that was a condition that affected the auction and, and, and that's how, that's why it was announced and discussed beforehand, not just so it would be binding, but all of the parties present conducted themselves on the basis of that and the property may have been bid higher. If a, if a, if a party bidding did not have to risk losing that, that bid deposit. So, that, we believe that was a material term as part of the sale order and, and that's why not, not incorporating by reference the PSA, not saying that, that its terms would govern on that issue, we believe is, was, is critical to the sale order and that's why that, why the court was correct in enforcing that. You're out of time, but I did have one question I really wanted to raise with you and that is, there was a stipulation, as I recall, that was entered into between the parties before, after the deal had gone south and before the Judge Suez-Fonte raised this interpretation issue. As I read that stipulation, you agreed that if the other side prevailed on this casualty issue, that they'd get back the 250. Is that correct? I, I don't believe that's the correct interpretation, Your Honor. The, the stipulation narrowed the issues because the SGA group had raised many additional issues that it had argued that the property wasn't in the same condition for a long period of time and this narrowed the issues, removed that one and, and, and agreed that we would go forward on the issue of, of whether it could, whether it could avoid the contract and, and on the basis of the, of the PSA. So, the stipulation did not include agreeing that the court could not consider this argument. We, I believe the argument had been referenced in other, at other times during the process, but I don't think it's correct to say that it was, that, that the decision on this was made Suez-Fonte by Judge Collins on that. He raised it in one of the arguments. We had, I believe, two arguments, if not more, and the parties briefed it and, and, you know, they agreed that everyone agreed, including Judge Collins, that we should specifically brief that issue of whether the, the order trumped the PSA. And so, it was fully briefed and, and I disagree in, I don't believe it was raised with Judge Collins that the point that we were precluded from, from arguing that or that Judge Collins was precluded from arguing that. That was not an objection made to Judge Collins. Any other questions? Thank you, counsel. Mr. Rudd. Thank you. Um, Mr. Jones says that, uh, perhaps Judge Sala intentionally, um, failed to include the PSA and intentionally decided to eliminate those buyer protections. But here's the thing. Nobody ever asked for that relief. Nobody ever came to Judge Sala and said, hey, we don't like these buyer protection provisions that allow the, the, um, buyer to recover its, uh, earnest money deposit. So, please eliminate those. That relief was never requested. So, there's no way that this order can be interpreted to say that those seven words eliminate all those buyer protections because nobody asked for that. Rather, what was asked at the hearing and what Judge Sala responded was, hey, can you confirm, Judge Sala, that there are no contingencies here and that the earnest money deposit will be, um, uh, will be forfeited if the buyer can't close. There's a huge difference, folks, between a buyer not being able to close and, and a buyer not being required to close. And Judge Morla, this goes to exactly to what you were talking about. This contract wasn't repudiated by the buyer. This contract was terminated by the buyer. Properly, timely, terminated by the buyer pursuant to the terms of the agreement. So, this wasn't a matter of the buyer not being able to close and can't closing. He did not have the obligation to close. The other issue, if those seven words in that sale order are the only things that govern this sale, that renders the entire PSA meaningless, right? And that can't possibly be what's happening. And the other thing, Mr. Jones says, well, the auction terms were, were laid out at the beginning of the auction. Yes, they were. And one of those auction terms was the parties had already signed the PSA at the time of the auction. The parties had already provided the $250,000 earnest money deposit at the time of the auction. Those were the terms of the auction. The PSA is included in it. And with respect to your other comment, Judge Morla, this is a windfall to the estate. All creditors have been paid already. They did not earn this $250,000 earnest money deposit. They didn't do anything to get it. This is a complete windfall to that estate. Your time is up if you want to wrap up. Okay. Thank you. At the end of the day, this court can correct what has been wronged. The PSA is enforceable. It was not superseded by the order. This court can read the PSA and read the sale order properly to make the determination that because the PSA was properly and timely terminated, SJ Group is entitled to the return of the earnest money deposit. Thank you, counsel. This case is submitted. This session of the Ninth Circuit is adjourned for the week.
judges: WARDLAW, BUMATAY, Gleason